IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYANN YOUNG, et al.,                  :
     Plaintiffs,                          :
                                          :
                                          :
       v.                               :          CIVIL NO. L-02-2766
                                          :
                                          :
CITY OF MOUNT RAINIER, et al.,          :
     Defendants.                          :
                                          :

## MEMORANDUM

Pending in this § 1983 police brutality case is the Defendants' Motion for Summary Judgment. For the reasons stated herein, the Court will, by separate Order, GRANT summary judgment with respect to the § 1983 claim, ENTER JUDGMENT for all Defendants, DECLINE to exercise supplemental jurisdiction over the state claims, and CLOSE the case.

## I.    Introduction

On the evening of March 21, 2001, officers from the City of Mount Rainier Police Department took Harrison Boodoo (hereinafter "Boodoo") into custody in order to transport him to Prince George's County Hospital for an involuntary psychiatric evaluation. Although it took less than fifteen minutes to reach the hospital, Boodoo was unconscious upon arrival, and he was pronounced dead shortly thereafter.

MaryAnn Young, Boodoo's sister and the personal representative of his estate, and Martin Boodoo, his father, (hereinafter "Plaintiffs") sued the City of Mount Rainier, the Town of Bladensburg, individual Mount Rainier police officers (Herbert McKoy, Mark Ferencin, and Paul Corridean), and individual Bladensburg police officers (William Parr and Roger Surles). Plaintiffs allege that (i) the officers used excessive force while taking Boodoo into custody,

(ii) the officers restrained Boodoo using a risky and disapproved method known as "hogtying," causing him to asphyxiate while he lay face down in the backseat of the police car, and (iii) the City of Mount Rainier and the Town of Bladensburg (hereinafter the "Municipal Defendants") failed to adequately train, instruct, and supervise their officers.   Plaintiffs assert a claim under 42 U.S.C. § 1983 as well as several state law causes of action.[1]

Plaintiffs' claims against the Municipal Defendants are dependent on the success of their claims against the individual police officers.  Under § 1983, to hold the Municipal Defendants liable, Plaintiffs must first establish that at least one police officer violated Boodoo's constitutional rights.[2]  If the Plaintiffs fail in this, their claims against the Municipal Defendants must likewise fail.  Accordingly, the Court separated out the claims against the Municipal Defendants and stayed discovery on those claims until the claims against the individual police officers were resolved.[3]

Discovery has concluded regarding the claims against the officers, who have moved for summary judgment.  Regarding the § 1983 claim, they contend that they did not violate Boodoo's constitutional rights and, further, that they are entitled to qualified immunity.  As to

---

[1]        The state law causes of action include:  (i) wrongful death, (ii) survival action, (iii) negligence, (iv) assault/battery, (v) false arrest/false imprisonment, (vi) conspiracy and constructive fraud, and (vii) violation of the Maryland Declaration of Rights.

[2]        Local governments can be held liable for constitutional violations only if (i) an individual defendant committed an unconstitutional act, and (ii) the individual was executing an official policy or custom of the government.  Monell v. Department of Soc. Servs., 436 U.S. 658, 690-91 (1978).  Likewise, to succeed on a failure-to-train claim, a plaintiff must first show that the government's employee engaged in a constitutional violation.   Young v. City of Mount Rainier, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in [the Fourth Circuit] that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee.").

[3]        See July 18, 2005 Memorandum Opinion and Order (Docket Nos. 103-104).

the state law claims, the officers argue that the claims are procedurally barred or, in the alternative, that they are entitled to "public official immunity."  As discussed below, the officers are entitled to summary judgment on the § 1983 claim.  Because no federal claims remain, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which can be re-filed in state court.

## II.      Facts

### A.      The Detention

Boodoo, a resident of the City of Mount Rainier, Maryland, was acting erratically on the night of March 21, 2001.  According to his father, Martin Boodoo, with whom he lived, Boodoo was jumping around, cursing, screaming, and slamming the door.  He then retrieved two knives from the kitchen and left the house.[4]  A neighbor called the father, stating that Boodoo was outside her home, yelling and wielding the two knives.[5]  The father called the police, explaining that his son was running down the street brandishing two knives.[6]

Boodoo left the neighbor's yard and walked to the Mount Rainier police station, which was nearby.  Someone from the police force (identity unknown) called Martin Boodoo to report that his son, Harrison, was outside the station.[7]  Around the same time, a dispatcher asked officers to respond to the station.  Meanwhile, Mount Rainier police officer Paul Corridean, a

---

[4]      Statement of Martin Boodoo (Defs.' Renewed Mot. for Summ. J., Ex. 1).

[5]      Deposition of Gloria Gutierrez at 6-7, 10 (Defs.' Renewed Mot. for Summ. J., Ex. 3) (hereinafter "Gutierrez Dep.").

[6]      Id. at 13; Mount Rainier Police Dept. Daily Radio Log (Defs.' Renewed Mot. for Summ. J., Ex. 19) (hereinafter "Daily Log").

[7]      Gutierrez Dep. at 15.

named defendant who was moonlighting as a security guard at a nearby liquor store, was approached by a passerby and told that there was a man in his pajamas "jumping around" in the middle of the street.  Officer Corridean called the station's dispatcher, who stated that he had received the same report from others.[8]

Officers Herbert McKoy and Mark Ferencin, both named defendants, responded to the dispatch and approached Boodoo, who was outside the police station.  The dispatcher had warned them that Boodoo might be carrying knives, so the officers handcuffed Boodoo and searched him for weapons.[9]  During the search, Boodoo kicked at the officers.[10]  Officer Corridean then arrived on the scene and, at his suggestion, the officers shackled Boodoo's legs together.[11]  They did not, however, use a chain to connect Boodoo's hands to his legs.

The officers then placed Boodoo into Officer Ferencin's cruiser so that he could be transported to the Prince George's County Hospital for an emergency psychiatric evaluation.  They placed him in the back seat in a seated position,[12] but they did not strap Boodoo into a

---

[8]     Deposition of Paul Corridean at 17 (Defs' Renewed Mot. for Summ. J., Ex. 11) (hereinafter "Corridean Dep.").

[9]     Deposition of Herbert McKoy at 23-24 (Defs' Renewed Mot. for Summ. J., Ex. 5) (hereinafter "McKoy Dep."); Deposition of Mark Ferencin at 24 (Defs' Renewed Mot. for Summ. J., Ex. 10) (hereinafter "Ferencin Dep.").  The officers did not find any weapons during their search of Boodoo, who apparently had disposed of the knives before reaching the station.

[10]     Ferencin Dep. at 28; McKoy Dep. at 27.

[11]     Ferencin Dep. at 28; McKoy Dep. at 27-29; Corridean Dep. at 22.

[12]     Plaintiffs speculate that the officers placed Boodoo in the cruiser on his stomach "with his arms and legs restrained behind his body."  (Pl.'s Opp. to Defs' Renewed Mot. for Summ. J. at 14.)  Officers Ferencin and Corridean, however, both testified that Boodoo was seated in the car and that his handcuffs were not connected to his leg shackles.  (Ferencin Dep. at 39-40; Corridean Dep. at 39-40.)  Plaintiffs have produced no evidence to contradict the officers' account.  See Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996) (finding that the District Court,

seatbelt.  At 11:20 p.m., Officer Ferencin, with Boodoo on board, departed for the hospital.[13]

Officers Corridean and McKoy remained behind to speak with the father, who arrived at the

scene either shortly before or after Officer Ferencin left.[14]

### B.    Roadside Stop

While en route to the hospital, Boodoo began kicking at the rear passenger-side window

of the cruiser.  Sometime around 11:25 p.m., Officer Ferencin called his dispatcher, reported

Boodoo's actions, requested backup, and pulled over to the side of the road to wait.  At this time,

Boodoo was prone (lying on his stomach) on the backseat, kicking at the window.[15]  Boodoo

could not have done this had he been hogtied.  Officer Ferencin opened the back door and held

Boodoo's feet until backup arrived.[16]

Three officers from the Bladensburg Police Department -- William Parr, Roger Surles,

and Armando Parker[17] -- arrived within a few minutes.  Officer Parr opened the door at Boodoo's

---

in ruling on a motion for summary judgment, should have rejected plaintiffs' speculation about what happened during a police stop because they presented no evidence to contradict the officers' testimony).

[13]    Police Communication Tapes Transcript at 2 (Defs' Renewed Mot. for Summ. J., Ex. 20A) (hereinafter "Police Transcript").

[14]    McKoy Dep. at 33.

[15]    Plaintiffs speculate that because no one reported damage to the window, Boodoo could not have been kicking at it.  Plaintiffs, however, have offered no evidence to contradict Officer Ferencin's testimony that Boodoo was kicking at the window.  Moreover, a man kicking from a prone position would not necessarily cause damage, and Officer Ferencin immediately pulled over and restrained Boodoo's legs when the kicking began, thus reducing the chance for Boodoo to damage the car.

[16]    Ferencin Dep. at 42, 46; Police Transcript at 3.

[17]    Plaintiffs did not name Officer Parker as a defendant.

head and told him to calm down.[18]   Boodoo relaxed.

The officers claim that they then laid Boodoo on his side.  They testified that at no point did they hogtie him or otherwise connect his leg shackles to his handcuffs.[19]  A witness (a security guard at the hospital), however, testified that when Boodoo arrived at the hospital less than two minutes later, he was lying on his stomach in a hogtie position.

To shackle a detainee's legs, officers place cuffs connected by a short chain around the detainee's ankles.  Sometimes, to further restrict a detainee's movement, officers connect a second chain from the leg shackles to the handcuffs.  The second chain can be positioned at the front or back of a detainee's body.  Hogtying occurs when the detainee's handcuffs and leg shackles are connected behind his body, and the connection is short enough to bend his knees and draw his feet up close to his buttocks.

In this case, there is no evidence that a second chain was used.  The hospital security guard testified that he did not see such a chain.  Rather, he explained that Boodoo was handcuffed behind his back, not in front, and that the short leg chain had been pulled up to Boodoo's handcuffs and somehow draped over them.[20]   As stated, the officers dispute the testimony of the hospital security guard and deny that they hogtied Boodoo.  For purposes of summary judgment, however, this Court must accept the guard's statement as true because it

---

[18]    Deposition of William Parr at 17-18 (Defs' Renewed Mot. for Summ. J., Ex. 12) (hereinafter "Parr Dep.").

[19]    Ferencin Dep. at 51; Deposition of Roger Surles at 46-47 (Defs' Renewed Mot. for Summ. J., Ex. 13) (hereinafter "Surles Dep."); Interrogatory of William Parr at 5 (Defs' Renewed Mot. for Summ. J., Ex. 9).

[20]    Deposition of Ahmad Woodward at 41-42 (Defs' Renewed Mot. for Summ. J., Ex. 14) (hereinafter "Woodward Dep.").

favors the non-moving parties.  The Court will also assume that the officers hogtied Boodoo

during the roadside stop and laid him on his stomach.  Because Boodoo was kicking at the

window before the stop, he could not have been hogtied before then.

After the stop, Officer Ferencin continued to the hospital, this time with his sirens and

lights activated.  Officer Parr asked the dispatcher to alert the hospital that Boodoo was on his

way, but it is not clear that the dispatcher had the opportunity to do so.[21]   Officer Ferencin

arrived at the hospital at 11:31 p.m., after a drive of approximately one and one half minutes.[22]

### C.        Arrival at the Hospital

Officer Ferencin was joined at the hospital by Officers McKoy and Corridean, and by

officers from the Town of Bladensburg.  One of them got a gurney, and they opened the back

door at Boodoo's feet.  The officers testified that they tried to coax Boodoo out of the car, but he

was limp and unresponsive.[23]  Thereupon, Officer McKoy pulled Boodoo from the car by his

feet, assisted by other officers.[24]  Unfortunately, they dropped Boodoo, whose head struck first

the car and then the ground.   There is no evidence that the officers dropped Boodoo

intentionally.  Rather, he slipped out of their grasp as they were engaged in the cumbersome task

of removing him (in an unresponsive state) from the car.[25]

Boodoo made no noise in response to hitting his head.  The officers placed him on the

---

[21]        Police Transcript at 4.

[22]        Ferencin Dep. at 76; Police Transcript at 4.

[23]        McKoy Dep. at 40.

[24]        It is unclear who assisted Officer McKoy.

[25]        Woodward Dep. at 13;  Deposition of Michael Jones at 9-10 (Defs' Renewed
Mot. for Summ. J., Ex. 16).

gurney.  Boodoo was wheeled into the "trauma room."  A doctor instructed Officer Ferencin to

remove the handcuffs and shackles, which he did.[26]  Boodoo was pronounced dead at 11:57

p.m.[27]

### D.     The Autopsy Report

The following morning, the Office of the Chief Medical Examiner performed an autopsy

on Boodoo.  The cover page of the Autopsy Report is a form that offers the medical examiner a

checklist of five broad categories generally describing the cause of death: (i) "natural,"

(ii) "accident," (iii) "suicide," (iv) "homicide," and (v) "undetermined."  The doctors who

performed the autopsy, Maryland Associate Pathologist Leszek Chrostowski, M.D., and

Assistant Medical Examiner, Theodore M. King, Jr., M.D., checked the line next to

"undetermined."[28]  On this same page, they also offered the following brief explanation

regarding the cause of death: "Cardiac Arrythmia Due to Acute Psychotic State Complicating

Myocardial Fibrosis And A Fatty Liver Associated With Multiple Injuries And Positional

Asphyxia Related To Police Arrest And Restraint."[29]

The doctors also prepared a nine-page narrative describing their physical examination

and then elaborating on their opinion as to the cause of death.  Echoing the brief explanation on

the cover page, the medical examiners attributed Boodoo's death to a combination of factors:

---

[26]     Ferencin Dep. at 69-70

[27]     See Prince George's County Police Executive Summary: Police In-Custody Death
Involving Mount Rainier Police at 3 (Defs' Second Renewed Mot. for Summ. J., Ex. 22).

[28]     Autopsy Report Cover Page (Defs' Second Renewed Mot. for Summ. J., Ex. 24).

[29]     Id.

This 36-year-old,[30] Indian Male, Harrison Boodoo, died of Cardiac Arrythmia (spontaneous interruption of the normal electrical rhythm of the heart) due to Acute Psychotic State Complicating Myocardial Fibrosis and a Fatty Liver Associated with Multiple Injuries And Positional Asphyxia related to police arrest and restraint.

The remainder of the opinion section simply explains this conclusion in further detail:

Autopsy showed myocardial fibrosis (scar in the heart) and a fatty liver (type of liver disease) together with superficial injuries of the head, neck, chest and extremities. The injuries of the wrist and ankles are consistent with the reported use of handcuffs and leg irons respectively to restrain the deceased. The petechial hemorrhages of the eyes, right eyelid and gums support an asphyxial component to this mans death. The contraction bands of the heart are changes related to resuscitative efforts.

Whereas some arrhythmic deaths are the result of Natural disease alone such as myocardial fibrosis or fatty liver, and other deaths are due to injury or positional asphyxia alone, Mr. Boodoo's death was the result of the interaction of several factors. These factors all together triggered an arrhythmic death and included the role of behavior (psychotic state - physiologic stress on the body), medical disease (myocardial fibrosis and fatty liver - either condition of which can alone cause sudden death) and multiple injuries and positional asphyxia (injuries can trigger arrhythmic death) related to police arrest and restraint. Because the cause of the cardiac arrhythmia that killed Mr. Boodoo was multifactorial, the manner of death is Undetermined. Reportedly, Mr. Boodoo was acting in an acute psychotic state on March 21, 2001; when he was arrested and restrained by police who seated him in a police vehicle and took him to a local hospital, where he was found face down on the back seat of the vehicle in an unresponsive state hand cuffed and leg shackled. Resuscitative efforts failed. Tests for drugs and alcohol were negative.

See Autopsy Report at 9 (Defs' Second Renewed Mot. for Summ. J., Ex. 24).[31]

_____

[30]    Boodoo was actually 34 years old at the time of his death.

[31]    Plaintiffs' medical expert did not dispute these findings, other than to opine that the cause of death should be "homicide" rather than "undetermined." (Deposition of Dr. Vincent Hill at 17 (Defs' Reply to Pl.'s Opp. to Defs' Renewed Mot. for Summ. J., Ex. 29) (hereinafter "Hill Dep.")). The officers' medical expert disputes the finding that positional asphyxia contributed to the death. (Expert Report of Dr. Tom Neuman at 2 (Defs' Renewed Mot. for Summ. J., Ex. 27.)) Indeed, the officers contend that positional asphyxia does not exist. (Defs' Renewed Mot. for Summ. J. at 54.) Nevertheless, because the evidence must be viewed in the

### III.    Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

### IV.    Analysis

Section 1983 allows individuals to seek redress for alleged violations of the United States Constitution by those acting under color of state law.  See Monroe v. Pape, 365 U.S. 167 (1961). Plaintiffs assert that the officers violated (i) Boodoo's right to be free from unreasonable seizures under the Fourth Amendment, and (ii) his substantive due process rights under the Fourteenth Amendment.  The Court will address and reject the constitutional allegations in turn.

### A.    Fourth Amendment–Unreasonable Seizure

The Fourth Amendment protects against "unreasonable searches and seizures."  Courts have interpreted the Fourth Amendment as protecting people against the use of excessive force

---

light most favorable to Plaintiffs, the Court will treat positional asphyxia as a cause of death.

during an arrest.[32]  See, e.g., Brower v. County of Inyo, 489 U.S. 593 (1989).  Although Boodoo

was not formally placed under "arrest," the Fourth Amendment applies to the officers' actions

while taking Boodoo into custody.  See Riley v. Dorton, 115 F.3d 1159, 1163 (4th Cir. 1997)

(internal quotations omitted).  After the initial detention, however, Boodoo, whether or not he

was under arrest, assumed the status of a pretrial detainee,[33] and claims of excessive force in that

context are analyzed under the Due Process Clause of the Fourteenth Amendment.[34]

Accordingly, Plaintiffs' Fourth Amendment claim applies only to the period beginning when the

officers approached Boodoo and ending when they placed him in the cruiser.  Plaintiffs allege

that the officers used excessive force when they took Boodoo into custody by (i) beating him,

and (ii) hogtying him.

### 1.   Beating

Even viewing the facts in a light most favorable to Plaintiffs, there is no evidence to

support the claim that Boodoo was beaten.   Officers Ferencin, Corridean, and McKoy, who were

the only witnesses to the detention, all deny that they beat Boodoo or otherwise used undue force

---

[32]      The standard for evaluating a Fourth Amendment claim is the "objective reasonableness" of the force used in light of all the attending circumstances.  Relevant factors include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether [the person] is actively resisting arrest." Graham v. Connor, 490 U.S. 386, 396 (1989).

[33]      As the Fourth Circuit explained in another case involving the Mount Rainier police escorting a person to the hospital for an involuntary psychiatric evaluation, although a person may not be a "typical pretrial detainee," if he was "involuntarily taken into custody," the officer "owed him the same duties owed to a more typical pretrial detainee." Young, 238 F.3d at 575.

[34]      See Riley, 115 F.3d at 1161.  The Fourth Circuit has explicitly rejected the "continuing seizure" theory, under which the Fourth Amendment continues to apply after the person is taken into custody.  Id. at 1162.

to subdue him.  By virtue of his death, Boodoo is unable to provide his own account.  The

Autopsy Report states that at the time of his death, Boodoo had "superficial injuries of the head,

neck, chest and extremities," which included a black eye, abrasions, and other injuries.[35]

Plaintiff's own medical expert, Dr. Vincent Hill, concedes that Boodoo's black eye was not a

recent injury and that the superficial abrasions on his wrists and ankles were consistent with

being handcuffed and shackled.[36]  Dr. Hill also noted that the superficial injuries on Boodoo's

face and upper extremities were consistent with a person falling on his face,[37] which occurred

when Boodoo accidentally slipped out of the officers' grasp at the hospital.  Because the fall

occurred when Boodoo was a pretrial detainee, the Fourth Amendment does not apply to any

injuries Boodoo sustained then.  Moreover, Dr. Hill found no patterned injuries suggesting that

Boodoo had been struck with a baton or a flashlight.[38]  For these reasons, the Court finds that no

reasonable jury could conclude that the officers beat Boodoo when they took him into custody.

## 2.      Hogtying

Plaintiffs also claim that, by hogtying Boodoo, the officers used "unreasonably excessive

and aggressive force to restrain" him.  As discussed in the statement of facts, there is no

evidence that the officers hogtied Boodoo when they took him into custody.  The officers

consistently testified that when they seated him in the car, his hands were cuffed and his legs

were shackled, but his hands and legs were not connected.  As mentioned, if Boodoo had been

---

[35]     Autopsy Report at 8-9.

[36]     Hill Dep. at 36-37.

[37]     Id. at 37.

[38]     Id. at 51.

hogtied at the outset, he could not have kicked at the window of the cruiser.  There is ample, uncontroverted evidence that Officer Ferencin stopped his cruiser because Boodoo was kicking the window.  Thus, the hogtying could only have occurred while Boodoo was a pretrial detainee, and the Fourth Amendment does not apply.  Accordingly, the officers are entitled to summary judgment on all Fourth Amendment claims.

### B.       Fourteenth Amendment–Due Process

The Due Process Clause of the Fourteenth Amendment protects detainees against police conduct that "shocks the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998).  The Fourth Circuit has recognized two types of police conduct as sufficiently shocking to support a Fourteenth Amendment claim: (i) the use of excessive force, and (ii) deliberate indifference to a detainee's serious need for medical care or to a substantial risk of serious harm.

Excessive force under the Fourteenth Amendment occurs when force is employed "in a malicious or sadistic manner, and . . . the injuries resulting from such force were more than de minimis."  Carr v. Deeds, 453 F.3d 593, 606 (4th Cir. 2006).   "The proper inquiry is whether the force applied was in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)) (internal quotation marks omitted).  This test turns on the subjective intentions of the officers.

Deliberate indifference arises when a defendant fails to protect a pretrial detainee from a known and substantial risk of harm.  See Young v. City of Mount Rainier, 238 F.3d 567, 574-75 (4th Cir. 2001).  "Deliberate indifference is a very high standard–a showing of mere negligence will not meet it."  Grayson v. Peed, 195 F.3d 692 (4th Cir. 1999).  This test also focuses on the

subjective intentions of the officers.  To warrant a finding of deliberate indifference, "the [officer] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).   Restated, it requires that "the defendants <u>actually knew of</u> and <u>disregarded</u> a substantial risk of serious injury to the detainee or that they <u>actually knew of</u> and <u>ignored</u> a detainee's serious need for medical care."  <u>Young</u>, 238 F.3d at 575-76 (emphasis added).

Plaintiffs allege that the officers violated Boodoo's due process rights because (i) they knew that he had serious medical problems and needed prompt medical attention, (ii) they dropped him as they were removing him from the police cruiser at the hospital, and (iii) they hogtied him and placed him face-down, thereby putting him at risk for positional asphyxia. These claims all fail.

### 1.    Boodoo's Medical Needs

Plaintiffs contend that the officers were deliberately indifferent to Boodoo's serious medical needs because they failed to get him immediate medical attention.  To succeed, Plaintiffs must show that the officers (i) actually knew that Boodoo was in need of immediate medical attention, but (ii) ignored that need.  <u>See</u> <u>Young</u>, 238 F.3d at 575-76.

Boodoo's mental agitation was obvious to the officers.  Nothing about Boodoo, however, suggested that he was suffering from any of the other conditions mentioned in the autopsy: myocardial fibrosis and a fatty liver.  In fact, there is no evidence in the record that either Boodoo or his family were themselves aware of these conditions.  When Officers McKoy and Ferencin encountered Boodoo, he was neither bleeding, limping, nor vomiting, nor showing any

signs of physical–as opposed to mental–problems.[39]

Moreover, the officers were taking Boodoo directly to the Prince George's County Hospital, so that he could receive immediate medical assistance.  The police were, therefore, taking the very step that Plaintiffs assert they should have taken.[40]  Accordingly, the officers displayed no deliberate indifference to Boodoo's medical needs.

### 2.        Boodoo's Fall

As discussed above, there is no evidence from which a reasonable jury could conclude that Boodoo's fall was other than accidental.  The officers might have been negligent when they removed Boodoo from the car, but both deliberate indifference and excessive force claims require "more than ordinary lack of due care for the prisoner's interests or safety." Grayson, 195 F.3d at 695 (quoting Whitley, 475 U.S. at 319) (internal quotation marks omitted).  Both claims, therefore, fail.

### 3.        Positional Asphyxia–Hogtying

### A.        No Constitutional Violation

As mentioned, a Fourteenth Amendment claim requires that the officers acted either with "deliberate indifference to a substantial risk of serious injury," or that their behavior was

---

[39]        Charles Key, Plaintiffs' expert on police procedure, speculated that Boodoo may have been unconscious by the time Officer Ferencin resumed the trip to the hospital after the roadside stop.  (Affidavit of Charles J. Key, Sr. at 18-19 (Pl.'s Opp. to Defs.' Renewed Mot. for Summ. J., Ex. 9) (hereinafter "Key Affidavit")).  This opinion is based on pure supposition and cannot be factored into the summary judgment equation.

[40]        Plaintiffs fault the officers for failing to call an ambulance.  The officers originally called for an ambulance, but they cancelled the request when Boodoo calmed down, opting instead to make the one-and-a-half-minute trip to the hospital themselves. (Police Transcript at 3-4).  Nothing in this fact pattern can be stretched to fit the definition of deliberate indifference.

"malicious and sadistic."  It makes sense to analyze the deliberate indifference claim first.  If Plaintiffs cannot raise a jury issue on this claim, they cannot hope to prove that the officers acted sadistically.

 Because the deliberate indifference standard is subjective, Plaintiffs must show that the officers[41] <u>actually knew</u> (i) that positional asphyxia exists, (ii) that hogtying and placing a person face-down can cause positional asphyxia, and (iii) that Boodoo was at a <u>substantial</u> risk of suffering from positional asphyxia during the ninety-second ride to the hospital.  Plaintiffs' proof on these issues is insufficient to reach a jury.

In some excessive force cases, the officers' state of mind can clearly be demonstrated through their actions, such as a beating or failing to assist a person bleeding to death.  Unlike those situations, the risk posed by hogtying is not self-evident.  Indeed, medical literature suggests that healthy people who lie face-down in a hogtied position for fifteen minutes do not suffer "any clinically relevant changes in respiratory or ventilatory function."[42]

As a result, Plaintiffs must show that the officers on March 21, 2001 were aware of the risks of hogtying through training or some other source.  In an effort to meet this burden, Plaintiffs offer the affidavit of Charles Key, a former officer now retired from the Baltimore Police Department.   Key opines that the officers' actions in hogtying Boodoo were

---

[41]     Officers McKoy and Corridean were not present at the roadside stop and therefore were not involved in hogtying Boodoo.  They are entitled to summary judgment on this basis alone.

[42]     Theodore Chan et al., <u>Restraint Position and Positional Asphyxia</u>, 30 Annals of Emergency Medicine 578 (1997) (Defs' Reply to Pl.'s Opp. to Defs.' Renewed Mot. for Summ. J., Ex. 32).  Dr. Hill said that he agreed with the study as it relates to healthy people.  Positional asphyxia has been most commonly encountered in people who are unhealthy or agitated.  (Hill Dep. at 46-48, 97, 119, 130).

"[in]consistent with standard police practices and policies."[43]  In support of this assertion, he points to materials published by the Commission for the Accreditation of Law Enforcement Agencies (CALEA) and the International Association of Chiefs of Police (IACP).  According to Key, CALEA has warned that "some techniques" can cause positional asphyxia.[44]  The IACP, he states, has specifically advised against the practice of hogtying.[45]  What Key fails to do, however, is to establish that these admonitions were part of the training received by the defendant officers.  Prior to Boodoo's death, there is no evidence that the officers ever received or read these publications.  Key does not attach them to his affidavit.

The Court must, therefore, assess the evidence in the record bearing on each of the officers' knowledge.  With respect to Officer Parr, there is nothing in the record on this point.  Plaintiffs did not even ask him about positional asphyxia at his deposition.  Officer Ferencin testified that he had specifically been told in two different training sessions that positional asphyxia does not exist.[46]  No evidence contradicts his assertion.

During his deposition, which took place four and a half years after Boodoo died, Officer Surles testified that positional asphyxia "always" comes up in training, but only in a "general" fashion.[47]  He did not, however, say whether the subject was ever covered in training before 2001.  To the contrary, his testimony suggests that the practice has come under scrutiny only

---

[43]     Key Affidavit at 4 (Pl.'s Opp. to Defs' Renewed Mot. for Summ. J., Ex. 9).

[44]     Id. at 10.

[45]     Id. at 11.

[46]     Ferencin Dep. at 58-59.

[47]     Surles Dep. at 31.

recently.  Officer Surles stated that it was "in the last year or two that everybody is concerned with positional asphyxiation, you know, that the policy says sit them up."[48]  He acknowledged that officers are told not to place people prone and face-down, "and now they don't want you to have them down at all."[49]  He surmised that hogtying is not allowed because it might increase the chance of positional asphyxia,[50] but Plaintiffs have completely failed to show that he possessed this knowledge back in 2001.

Even if the officers were aware of positional asphyxia in general, there is nothing to suggest they appreciated that Boodoo in particular was at a substantial risk.  It is doubtful that an officer, even one aware of positional asphyxia, would think there was a substantial risk that a person would asphyxiate during a ninety-second drive to the hospital.  Even Plaintiffs' medical expert, Dr. Hill, concedes that asphyxia takes five minutes (if the person is losing blood) to twenty minutes (if the person is submerged in ice water), perhaps longer if the person is getting some air.[51]  Further, the officers were completely unaware of the heart and liver problems that the autopsy credits with contributing to Boodoo's death.  Given this lack of knowledge and the short time during which Boodoo could have been hogtied, no reasonable jury could find that the officers actually knew they were putting Boodoo at substantial risk of death and did it anyway.  Hence, the Court finds that the officers did not violate Boodoo's due process rights.

### B.        Qualified Immunity

---

[48]        Id. at 24.

[49]        Id. at 31.

[50]        Id. at 30.

[51]        Hill Dep. at 65, 123.

18

Even if hogtying Boodoo were a constitutional violation, Plaintiffs' claim would fail under the qualified immunity test, which requires that the right violated be "clearly established."[52]   The core principle behind this requirement is that officers must have been on notice that their actions violated the Constitution.  See Robles v. Prince George's County, 302 F.3d 262, 270 (4th Cir. 2002).[53]

Typically, a constitutional right is clearly established if there is controlling authority in the jurisdiction where the constitutional violation occurred.  Owens ex rel. Owens v. Lott, 372 F.3d 267 (4th Cir. 2004).  While the "very action in question [need not] previously [have] been held unlawful," the unlawfulness must be apparent in light of pre-existing law.  Wilson v. Layne, 526 U.S. 602, 615 (1999) (citation omitted).  If there is no controlling authority in the jurisdiction, then courts should look to see if a consensus has been reached in other jurisdictions.  If, however, there is no consensus to be found, then the "right cannot be clearly established for qualified immunity purposes."  Owens, 372 F.3d at 280.

Neither the Supreme Court, nor the Fourth Circuit, nor the Maryland Court of Appeals has determined that there is a due process right to be free of restraint by hogtying.  There is no

---

[52]      A state actor is entitled to qualified immunity if two conditions are satisfied.  First, there must be a constitutional violation.  A court must determine that "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The court should focus on "the right [not] at its most general or abstract level, but at the level of its application to the specific conduct being challenged."  Trulock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001).  If there is a violation, the second question is whether the right violated was "clearly established" when the offense occurred.  Id.

[53]      "[N]ot every instance of inappropriate behavior on the part of police rises to the level of a federal constitutional violation," even if the police know they are violating police regulations or state law.  Robles, 302 F.3d at 271.

clear consensus among other circuits, either.  See, e.g., Garrett v. Athens-Clarke County, 378

F.3d 1274 (11th Cir. 2004) (hogtying an arrestee who violently resisted arrest and was lying

face-down near a running car's exhaust pipe was constitutional);  Cruz v. City of Laramie, 239

F.3d 1183 (10th Cir. 2001) (hogtying an impaired person was unconstitutional, but the right was

not clearly established in 1996);  Brandt v. Davis, 191 F.3d 887 (8th Cir. 1999) (hogtying a

juvenile who was kicking and banging his head in the patrol car was constitutional).  As a result,

the Court concludes that there was no clearly established right not to be hogtied in March 2001.

The officers, therefore, are entitled to qualified immunity.

## V.      Municipal Liability

A municipality is not liable on a failure-to-train claim unless a municipal officer has

committed a constitutional violation in the first place.  See Young, 238 F.3d at 579.

Accordingly, although the instant Motion for Summary Judgment concerns only the individual

officers, the claims against the Municipal Defendants necessarily fail as well.  The Court,

therefore, will dismiss the claims against them.

## VI.     State Law Claims

As stated, a federal district court may decline to exercise supplemental jurisdiction if it

has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c).  Because

the Court is dismissing the federal claims, it will decline to exercise supplemental jurisdiction

over the remaining state law claims.  See Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617

(4th Cir. 2001).

## VII.    Conclusion

The circumstances of this case are certainly unfortunate.  There is not, however,

sufficient evidence for a jury to conclude that the Defendants are liable under § 1983 for

Boodoo's tragic death.  Accordingly, the Court will, by separate Order, GRANT the Motion for

Summary Judgment, ENTER JUDGMENT for all Defendants, DECLINE to exercise jurisdiction

over the state law claims, and CLOSE the case.


Dated this 29th day of September, 2006.


_____/s/_____
Benson Everett Legg
Chief Judge